

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

**AURORA GALANTE and KEVIN JOHNS,**                  :

                                    **Plaintiffs,**                  : **09Civ.11-2312(SJF)(WDW)**

                                                                 :

                     -against-                     :        **AMENDED**
                                                                 :        **COMPLAINT**
**SUPPORT CLAIM SERVICES, INC,**                     :

                                                                 :   Trial by Jury Demanded
                                    **Defendant.**                   :

------------------------------------------------------------------------X

   **PLAINTIFFS AURORA GALANTE** and **KEVIN JOHNS** (hereinafter

collectively referred to as "Plaintiffs"), by their attorneys, Nesenoff and Miltenberg, LLP,

whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York

10001 alleges upon knowledge with respect to themselves, and upon knowledge,

information and belief as to all other matters, as follows:

## THE PARTIES

   1.    Aurora Galante ("Plaintiff Galante") is a pregnant female and citizen of

the United States who currently resides at 11 North Delaware Avenue, North

Massapequa, New York 11758 and who was formerly employed by the Defendant

Support Claim Services, Inc. (hereinafter Defendant SCS) in various roles.

   2.    Kevin Johns ("Plaintiff Johns") is Plaintiff Galante's husband, and was her

fiancée at all relevant times.   Plaintiff Johns is a citizen of the United States who

currently resides at 11 North Delaware Avenue, North Massapequa, New York 11758

and was employed by the Defendant SCS at all relevant times, until he was constructively

discharged.

3.     Upon information and belief, at all times herein, Defendant SCS has been an entity duly organized and existing under the laws of the State of New York, with more than 100 employees, and with headquarters located at 125 Baylis Road, Suite 290, Melville, New York 11747.  Defendant SCS regularly does business in New York City. Defendant SCS has been engaged in, inter alia, the business of arranging independent medical examinations (known as "IME's") and peer reviews and reviewing the resulting reports.  Defendant SCS also reviews and audits fee schedules based on the New York State Fee Schedule.

4.     Upon information and belief, Defendant SCS is a privately held company owned by multiple members of the Rogen family. Arthur Rogen (hereinafter "CEO Rogen") is the CEO of the company.

5.     Upon information and belief Defendant SCS employs one or more of CEO Rogen's children, including Jennifer Rogen Dagan, (hereinafter "Human Resources Manager Dagan") who serves as the Human Resources Manager and the Manager of Independent Medical Examination Readers, as well as Human Resources Manager Dagan's husband, Eitan Dagan, (hereinafter Sr. VP/COO Dagan), who serves as Senior Vice President of Operations and/or Chief Operating Officer.

6.     Defendant SCS employee Twenette Vasquez (known as "Teddy" and hereinafter referred to as "Manager Vazquez") is the manager of the Workers' Compensation Department, which handles insurance claims related to Worker's Compensation.

7.     Defendant SCS employee Gita "Sandy" Gordon (hereinafter referred to "Ms. Gordon") was at all relevant times, the assistant to Manager Vasquez since approximately February of 2010.

8.     Defendant SCS employee Donna Scalfano (hereinafter referred to "Ms. Scalfano") was at all relevant times, the assistant to Human Resources Manager Dagan at all times relevant hereto.

## JURISDICTION AND VENUE

9.     This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendant SCS' discrimination of Plaintiff Galante based on pregnancy and sex, as well as Defendant SCS' retaliation and wrongful discharge of both Plaintiff Galante and Plaintiff Johns.

10.     This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e)-5(f) and under 28 U.S.C.A. §§1331 and 1343(4).  This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law"), which is known as the Human Rights Law, to redress discrimination with respect to terms and conditions or privileges of employment.

11.     This court has additional supplemental and pendant jurisdiction over the related claims.

12.     This complaint is additionally brought pursuant to the New York City Administrative Code §§ 8-101 et seq., (the "Administrative Code") to redress discrimination with respect to terms and conditions or privileges of employments.  A majority of Defendant's business that was performed by the Plaintiffs was generated by and for New York City businesses.  Plaintiffs were in constant contact with New York

City businesses in their performance of work for Defendants.  As such, discrimination by Defendants affects New York City.

## PROCEDURAL REQUIREMENTS

13.     Plaintiff Galante filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and initially filed this action on May 12, 2011 within ninety (90) days of the receipt of a Notice of Right to Sue issued by the EEOC on February 16, 2011, and received on or about February 18, 2011, a copy of which is annexed hereto as Exhibit A.   Plaintiff Johns has also filed a complaint with the Equal Employment Opportunity Commission ("EEOC") but has not yet received a Notice of Right to Sue letter.   Plaintiffs reserve the right to amend this Complaint and add charges under Title VII when Mr. Johns Notice of Right to Sue is received.

14.     Plaintiff Galante seeks to recover the attorneys' fees incurred by this lawsuit pursuant to N.Y. Exec L. §§ 297.

15.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein, including assault.

16.     Plaintiff Galante demands a jury trial.

## STATEMENT OF THE CASE

17.     This is a proceeding to enforce the rights of the Plaintiffs and other persons similarly situated, to equal employment opportunities, their rights as employees and their civil rights as citizens of the United States and as New York State residents. Plaintiffs seek money damages, as well as an injunction restraining Defendant from maintaining a policy, practice, custom and/or usage of:

a.      Discrimination against Plaintiffs and other persons similarly situated because of sex and/or pregnancy, with respect to compensation, terms, conditions, and privileges of employment, including without intending to limit, hiring, transfer, promotion and pay; and

b.      Limiting, segregating and classifying employees of Defendant SCS in ways which deprive Plaintiffs and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of sex and/or pregnancy.

15.      Defendant SCS has consistently and/or purposefully and/or negligently deprived Plaintiffs and other persons similarly situated of the rights guaranteed to them under New York State and City Laws with the intent and design, both directly and indirectly, of fostering a hostile work environment and sexual and pregnancy discrimination, as well as retaliation, to the detriment of the Plaintiffs and other persons similarly situated.

**FACTUAL BACKGROUND**

18.      Plaintiffs were employed at Defendant SCS at all relevant times.

19.      Plaintiffs are employees within the meaning of the N.Y. Exec Law and the N.Y.C. Admin. Code.

20.      Plaintiffs were willing and able to perform their employment duties and obligations and were qualified for the employment position(s) they held at Defendant SCS. Plaintiff Galante is currently obtaining her graduate degree in Biology Education at Dowling College in Oakdale, New York.

21.     Defendant SCS was, at all times relevant herein, an "employer" within the meaning of 42 U.S.C. § 2000e-(b), as well as the Executive Law and the Administrative Code of New York State and New York City.

**OPERATIVE FACTS**
**PLAINTIFF GALANTE IS HIRED BY DEFENDANT SCS**

22.     On or about March 3, 2008, Plaintiff Galante accepted a position as a Claims Administrator for the Defendant SCS.  Plaintiff Galante's duties included serving as the assistant to Worker's Compensation Department Manager Vazquez, who was and is the manager of the Worker's Compensation Department.

23.     Plaintiff Galante had scheduled hours of 9 to 5, but was permitted to work around her class schedule as she worked towards her masters' degree.

**PLAINTIFF GALANTE RECEIVES EXTREMELY POSITIVE ACCOLADES**
**AND A SERIES OF RAISES AND PROMOTIONS**

24.     Three months after Plaintiff Galante started working at Defendant SCS, she was given a pay raise for excellent work.

25.     In August of 2008, Plaintiff Galante was promoted to the role of Proof Reader for the Workmen's Compensation Department.  Plaintiff Galante's new role involved reviewing Independent Medical Exam Reports and making sure that they were error proof.

26.     On or about a month after Plaintiff Galante's one year anniversary, Plaintiff Galante was given another excellent review and another raise.

**PLAINTIFF GALANTE IS ASSIGNED AND TAKES ON MANAGERIAL**
**TASKS, INCLUDING TRAINING DUTIES**

27.     After Plaintiff Galante was promoted, she continued to handle managerial tasks in the Workmen's Compensations department, particularly when Manager Vazquez

was absent.  At a certain point in time, Manager Vazquez decided to change her hours from 9 am-5 pm to 7 am-3 pm.   Thereafter, everyone looked to Plaintiff Galante to manage the Workman's Compensation Department after 3 pm on a regular basis.

28.   Plaintiff Galante was the only employee at Defendant SCS who could perform all of the tasks within the Worker's Compensation Department. In fact, Plaintiff Galante drafted the Worker's Compensation Department handbook and was responsible for training all new employees at the Worker's Compensation Department.

### PLAINTIFF GALANTE IS CHOSEN AS THE "QUALITY COMMITTEE MANAGER"

29.   As discussed more specifically below, in or around 2009, Defendant SCS stepped up its efforts to get special certification from an impartial accreditation organization known as "URAC."

30.   URAC requires that any company seeking certification create a "Quality Committee" as a way to audit themselves and address company issues. Defendant SCS asked Plaintiff Galante to take the role of Quality Committee Manager in February of 2010.  Plaintiff Galante continued to be responsible for all of her assigned tasks in the Worker's Compensation Department while she performed the Quality Committee Manager role.

31.   Additionally, Plaintiff Galante was personally involved in many of the measures taken by Defendant SCS in order to obtain URAC certification.   Plaintiff Galante drafted job descriptions for the entire company, revised the Worker's Compensation Department Handbook, drafted a Mail Room Handbook, and created all of the company nameplates.

32.     Upon information and belief, Plaintiff Galante was the ONLY previously non-managerial employee involved in the URAC certification process.

33.     As Quality Committee Manager, Plaintiff Galante was asked to meet with representatives from URAC and VP/COO Dagan.   When the URAC representatives asked why Defendant SCS had chosen Plaintiff Galante for the role, Sr. VP/COO Dagan responded that it was because Defendant SCS saw great potential in Plaintiff Galante and thought she was an excellent employee.

## PLAINTIFF GALANTE IS OFFERED THE ASSISTANT MANAGER'S ROLE

34.     In or about mid-April of 2010 Plaintiff Galante was approached by Manager Stuart Rosen (hereinafter "Manager Rosen"), who formally offered her the Assistant Manager role that she had already been performing by covering for Manager Vazquez and overseeing the Worker's Compensation Department generally.   In fact, doctors and clients regularly reached out to Plaintiff Galante above all other Worker's Compensation Department employees with their questions and concerns.

## DEFENDANTS DISCOVER THAT PLAINTIFF GALANTE IS PREGNANT

35.     On or about May 3, 2010, Plaintiff Galante advised HR Manager Dagan, Worker's Compensation Department Manager Vazquez and Manager Rosen that she was pregnant.

36.     There after Plaintiff Galante continued to perform all of the duties of the Assistant Manager.

37.     On or about June 20, 2010, Plaintiff Galante attended a meeting with CEO Rogan, Manager Rosen and Sharon Moore (hereinafter Ms. Moore), the New Accounts Department Manager.   At the meeting, Plaintiff Galante expressed her concern that some

employees in her department were acting insubordinately, and asked that an announcement be made that she was now the Assistant Manager of the Workmen's Compensation Department so that the people she was managing would understand that she was simply doing her job when she reviewed their work or provided direction to them.

38.    Plaintiff Galante was in the process of training Defendant SCS employee Karen Walker (hereinafter referred to "Ms. Walker") to assist with IME reports and Defendant SCS employee Suzy Schaller (hereinafter referred to "Ms. Schaller") to bill IME reports and how to handle "No Shows" (Situations where claimants did not appear for their IMEs).   Plaintiff Galante also assisted Ms. Gordon when Manager Vazquez was not present and trained her on certain aspects of her job.   Plaintiff Galante explained that she felt the parties would be more responsive to her training if they knew that she was the Assistant Manager.

39.    Plaintiff Galante explained to Manager Rosen that she felt like Ms. Walker, Ms. Gordon and Ms. Schaller would respond more efficiently to her requests and work assignments if they knew about her new title.

40.    Plaintiff Galante further complained that Ms. Gordon had become nasty to her and that people on the floor had started to treat her in a resentful and disrespectful manner.

41.    Manager Rosen advised Plaintiff Galante that he would think about her request.

42.     Plaintiff Galante was very confused as to what there was to think about because she had already been given the promotion and had been acting in the capacity of the Assistant Manager in the Workman's Compensation Department for quite some time.

## DEFENDANT ADVISES PLAINTIFF GALANTE THAT SHE CANNOT BE THE ASSISTANT MANAGER BECAUSE SHE IS PREGNANT

43.     Shortly after Plaintiff Galante arrived at work the following day, June 21, 2010, she received a phone call from Manager Rosen at approximately 8:00 am. Manager Rosen, in no uncertain terms, told Plaintiff Galante that the promotion was being taken away from her because of her pregnancy.

44.     Manager Rosen specifically advised Plaintiff Galante that the only reason Defendant SCS could no longer allow her to have the Assistant Manager's role was because of her pregnancy.  He explained to Plaintiff Galante that the pregnancy could lead to a lot of doctor's appointments and other issues and that maternity leave would interfere with Defendant SCS business.  He told her that it was simply a business decision.

## DEFENDANT FILLS THE ASSISTANT MANAGER ROLE WITH AN UNQUALIFIED REPLACEMENT

45.     Manager Rosen then advised Plaintiff Galante that since she could not serve as the Assistant Manager of the Worker's Compensation Department due to her pregnancy, Ms. Gordon would take the role.  At that time Ms. Gordon had only been employed at Defendant SCS for five months and was currently being trained on various things by Plaintiff Galante. Ms. Gordon was unable to properly read, edit or analyze IME reports. Ms. Gordon was unable to give insurance adjusters an accurate assessment of the

related insurance claim.  Plaintiff Galante expressed these sentiments during the meeting and Ms. Gordon's shortcomings were acknowledged by Manager Rosen.

46.     Plaintiff Galante further reminded her superiors that she was the only employee in the Workmen's Compensation Department who was able to perform all of the tasks in that area and that she was the person responsible for training employees in that department.  Defendant SCS repeatedly conceded that Plaintiff Galante was far more qualified for the position of Assistant Manager than Ms. Gordon.

47.     Defendant SCS nonetheless again confirmed to Plaintiff Galante that she would not get the job because she was pregnant, and they could not afford to have the Assistant Manager out on maternity leave.  Plaintiff Galante responded that she did not think it was fair that she would lose the position because she was pregnant.  Manager Rosen advised her that she just had "bad timing" with her pregnancy.

## PLAINTIFF GALANTE COMPLAINS ABOUT THE ADVERSE EMPLOYMENT ACTIONS

48.     Plaintiff Galante complained about the adverse employment actions to Assistant HR Manager Donna Scalfano.  Assistant HR Manager Scalfano expressed disapproval of management actions and told Plaintiff Galante that it "was not right."

49.     Thereafter Plaintiff Galante immediately sent an email to Manager Rosen advising him that she was very upset about the various employment actions.  Manager Rosen did not respond.

## DEFENDANTS TREAT PLAINTIFF GALANTE HOSTILEY AND AGAIN ADMIT THAT HER PREGNANCY IS THE ONLY REASON FOR THE ADVERSE EMPLOYMENT DECISION

50.     Thereafter, Manager Vazquez and Ms. Gordon started to treat Plaintiff Galante in an even more disrespectful and hostile manner.  Plaintiff Galante called Manager Rosen into the kitchen and told him that she felt she was being attacked by Ms. Gordon and by Manager Vazquez and wanted to have a meeting to discuss the possibility of changing departments.

51.     Plaintiff Galante told Manager Rosen that many employees in the Workmen's Compensation Department had become hostile to her since she had complained about the adverse employment decision and voiced her feelings that the decision was unfair.  Manager Rosen advised her that they could meet with Manager Vazquez to discuss the situation later.

52.     During this interaction, Manager Rosen again advised Plaintiff Galante in no uncertain terms that the only reason the Assistant Manager role was taken away from her was because she was pregnant and that the decision had nothing at all to do with her performance at work.

## MANAGER VAZQUEZ ASSAULTS PLAINTIFF GALANTE DURING THE MEETING AND ATTEMPTS TO CREATE PRETEXTUAL REASONS FOR THE ADVERSE EMPLOYMENT DECISION

53.     As promised, Manager Rosen called a meeting with Plaintiff Galante and Manager Vazquez.  Manager Vazquez was irate and approached the pregnant Plaintiff Galante, purposefully bumped into the chair Plaintiff Galante was sitting on, entered Plaintiff Galante's personal space, and menacingly threatened, to "whip [Plaintiff Galante's] ass." Manager Rosen did nothing to defend Plaintiff Galante, and instead tried to calm Manager Vazquez down because of her blood pressure.  Manager Rosen expressed no concern for Plaintiff Galante whatsoever.

54.     Upon information and belief, Defendant SCS allows for a hostile and physically intimidating workplace where violence is condoned.   A female employee threatened to punch another female employee in the face and nothing was done even though the victim reported the incident. An employee named John McManus regularly engaged in screaming incidents with other employees, and threatened to assault an elderly delivery person, but was never fired, because Sr VP/COO Dagan had tried to fire Mr. McManus previously, and when Mr. McManus refused to leave, Sr. VP/COO Dagan pushed him.   Mr. McManus stated in front of the whole office that he hated Plaintiff Galante so much he "hoped that she would die." Although this incident was reported to CEO Rogen, and even though Plaintiff Galante expressed fear for her safety, nothing was done about the behavior of Mr. McManus, or to make the workplace safer.

55.     In addition to his physical assault against at least one employee, Sr. VP/COO Dagan regularly yells at people on the floor in front of other employees until they cry, and is well known as being verbally abusive.

56.     During the meeting, Manager Vazquez made up several reasons for the adverse employment decision, specifically blaming Plaintiff Galante's attitude, and stating that she had received several complaints about Plaintiff Galante.  Plaintiff Galante responded that she had never been advised of any such complaints.

## CEO ROGEN CONFIRMS THAT THE ADVERSE EMPLOYMENT DECISION IS DUE TO PLAINTIFF GALANTE'S PREGNANCY

57.     Upon hearing the commotion, CEO Rogen entered the room where the meeting was being held and told Plaintiff Galante that she could not be the Assitant Manager because of her pregnancy. He then adds that the reason for the adverse

13

employment decision is not that she is pregnant, but because she will miss work for pregnancy related events such as doctor's appointments and maternity leave.

## PLAINTIFF GALANTE SUFFERS PREGNANCY RELATED HEALTH ISSUE

58.     During the rest of the day, Plaintiff Galante began to experience abdominal pain. The following day, Plaintiff Galante went to her doctor, who told her to take a day off of work to rest and to call if the pain got worse.

59.     On June 23, 2010, Plaintiff Galante returned to work and was immediately called into a meeting with Manager Rosen, Sr. VP COO Dagan, and Kendra Revis (hereinafter "Ms. Revis"), the manager of the Peer Review Department.

60.     SR. VP/COO Dagan advised Plaintiff Galante that he was unaware of what happened at the meeting the day before, and that he did not want to know what happened, but told Plaintiff Galante that she could be transferred to the Peer Review Department.  Plaintiff Galante was happy to be transferred given the hostile environment in the Worker's Compensation Department. Plaintiff Galante would continue to perform the same proof reading duties she had performed in the Worker's Compensation Department, but for Peer Review Reports instead of IME Reports.

61.     On June 24, 2010, Plaintiff Galante was forced to call out for abdominal pain.  On June 25, 2010, Plaintiff Galante was again forced to call out for abdominal pain and went to her doctor. Plaintiff Galante was advised that she was most likely suffering from colitis caused by stress.

62.     The doctor stated that is was likely necessary for Plaintiff Galante to go on disability, and scheduled her for a sonogram the following Monday.

63.     On June 28, 2010, Plaintiff Galante called Defendant SCS and explained her medical situation.  Because no managers were available to speak to Plaintiff Galante, Plaintiff Galante left a voice mail for the General Manager, Denise Wolf.

64.     At 11:00 am that same day, Plaintiff Galante received a call from Human Resources Manager Dagan.  Plaintiff Galante told Human Resources Manager Dagan that she had a doctor's appointment and a sonogram scheduled for that day, but that the doctor had recommended she would most likely need to go on disability.

65.     Human Resources Manager Dagan requested that Plaintiff Galante contact her following her doctor appointment that evening.

66.     At her doctor's appointment, the doctor diagnosed Plaintiff with colitis, and ordered her to obtain disability paperwork from her employer.   Plaintiff Galante e-mailed Human Resource Manager Dagan and advised her that she had to go on disability.

67.     The following day, Human Resources Manager Dagan sent Plaintiff Galante an e-mail asking how long she would be out on disability.

## DEFENDANTS VILOATE HIPPA AND EMPLOYEE PRIVACY BY REVEALING EMPLOYEE HEALTH INFORMATION

68.     Plaintiff Johns was working at SCS that day and went to pick up the disability forms for Plaintiff Galante. Human Resources Manager Dagan began to ask Plaintiff Johns questions about Plaintiff Galante's health and demanded to know what was wrong with her.  Plaintiff Johns felt compelled to reveal that Plaintiff Galante may have colitis and ovarian cysts.

69.     Human Resources Manager Dagan became sarcastic and told Plaintiff Johns she was "confused, because [she] ha[d] colitis but doesn't need to be out on disability."  She asked Plaintiff Johns how long Plaintiff Galante would need to be out.

Plaintiff Johns again felt obligated to reveal Plaintiff Galante's medical information and stated that the Doctor said she would need to be out for at least one month.

70.     At about 11:30 am Human Resources Manager Dagan came out onto the floor in front of many employees and asks Plaintiff Johns why Plaintiff Galante has not responded to Human Resources Manager Dagan's e-mail asking how long the disability will last, and sarcastically and dismissively discussing Plaintiff Galante's health issues on the floor amongst everyone in the office.

## DEFENDANT SCS THREATENS TO DROP PLAINTIFF GALANTE FROM COBRA

71.     Human Resources Manager Dagan further advised Plaintiff Johns to tell Plaintiff Galante that if she does not respond to Human Resources Manager Dagan e-mail message about how long she will be on disability by the end of the day, Defendant SCS would drop Plaintiff Galante from the insurance plan.   At about 11:00 a.m. that day, Plaintiff Johns called Plaintiff Galante at home to relay Human Resources Manager Dagan's threat.

## DEFENDANTS TRY TO FORCE PLAINTIFF GALANTE'S RESGINATION

72.     Plaintiff Galante immediately thereafter received a phone call from Sr. VP/COO Dagan.   Sr. VP/COO Dagan told Plaintiff Galante that she must speak to Human Resources Manager Dagan, because he didn't "want anything bad to happen."

73.     Sr. VP/COO Dagan further advised Plaintiff Galante that Human Resources Manager Dagan said that Plaintiff Galante was resigning from the company. Plaintiff Galante responded that that was absolutely not true, and noted that it did not make sense that anyone would think Plaintiff Galante was resigning because she had just had her fiancée pick up disability forms for her. Sr. VP/COO Dagan responded that

Human Resources Manager Dagan thought she was resigning because of her argument with Manager Vazquez and the fact that she had not been to work. Plaintiff Galante once again explained that she was out of work on doctor's orders and told Sr. VP/COO Dagan that she would be happy to have her doctor reach out to him. Sr. VP/COO Dagan refused Plaintiff Galante's offer and advised Plaintiff Galante that she must speak to Human Resources Manager Dagan instead. Plaintiff Galante asked to be transferred to Human Resources Manager Dagan.

74.    Human Resources Manager Dagan told Plaintiff Galante that Plaintiff Johns advised her that Plaintiff Galante simply did not want to return to work.

75.    Plaintiff Galante told Human Resources Manager Dagan that she did not believe that Plaintiff Johns said that, since it was not true, and that she did want to return to work and would do so as soon as the doctor allowed her to do so. Plaintiff Galante further advised Human Resources Manager Dagan that Plaintiff Johns was at the doctor appointment with her, and heard the doctor order her to go on disability.

## DEFENDANTS AGAIN VIOLATE HIPPA AND PRIVACY LAWS

76.    Human Resources Manager Dagan nonetheless insisted to Plaintiff that Plaintiff Johns told her that Plaintiff Galante wanted to quit. Plaintiff Galante again assured her that she was not quitting. Manager Dagan told Plaintiff Galante that she herself was suffering from colitis but that she did not take disability and did not understand why Plaintiff Galante needed to take disability. Plaintiff Galante responded that she was simply doing what the doctor told her to do.

77.    Human Resources Manager Dagan advised Plaintiff Galante that another SCS employee, (who shall herein be referred to as "SCS Employee Jane Doe" so that her

privacy is not again violated) had cysts, and further reasoned that SCS employee Jane Doe comes to work even though her "stomach is always swollen."

78.     Plaintiff Galante responded that she had to follow her doctor's orders for her health and for the health of her baby.

## DEFEDANTS FIRE PLAINTIFF GALANTE FOR TAKING DISABILITY

79.     Human Resources Manager Dagan then advised Plaintiff Galante that Defendant SCS needed to fill her position and that one of the managers wanted to put an employment advertisement in the newspaper but that she directed that no such advertisement be placed until Human Resources Manager Dagan was able to speak with Plaintiff Galante to see if she was going to return to work.

80.     Plaintiff Galante asked, "What am I supposed to do?  The doctor told me I have to go on disability."

81.     Human Resources Manager Dagan responded, "Well, think about how long it will be.  It will be six months until the baby comes.  Even Plaintiff Johns said that you will be out at least a month. That is too long. Even if you could come in for two hours a day, that would be better, but you are not. We need the position filled."

82.     Plaintiff Galante again asked, "What do you want me to do, the doctor said that I cannot work right now, I have to do what is best for me and the baby and listen to the doctor."

83.     Human Resources Manager Dagan responded, "If you are not going to come in, that is grounds for termination, and we have to let you go."

84.     Plaintiff Galante asked if she was still entitled to COBRA, and Human Resources Manager Dagan responds that she gave the COBRA paperwork to Plaintiff Johns.

85.     Plaintiff Galante then asked, "Will you fight me for unemployment?" to which Human Resources Manager Dagan responded "No."   See follow up emails regarding unemployment and COBRA annexed hereto as Exhibit 2.

## DEFENDANT REVEALS PLAINTIFF GALANTE'S HEALTH INFORMATION AGAIN

86.     Upon information and belief, following Plaintiff Galante's request for disability and subsequent termination, Human Resources Manager Dagan repeatedly violated HIPPA laws by discussing Plaintiff Galante's health information in front of and with employees, including having phone conversations with Plaintiff Galante about her health in front of other employees and speaking to Plaintiff Johns about Plaintiff Galante's health and in front of other employees.

87.     Upon information and belief, Human Resources Manager Dagan regularly violates HIPPA laws and constantly discloses employees personal Health information.

88.     Human Resources Manager Dagan has also revealed to the entire office that one or more employees were on welfare and/or other forms of public assistance,  had made worker's compensation claims, and that certain employees wages were being garnished.

89.     Multiple employees have complained to CEO Rogen about Human Resources Manager Dagan's lack of confidentiality, and he has failed to address the situation.

## DEFENDANT SCS RETALIATES AGAINST PLAINTIFF JOHNS AND CONSTRUCTIVELY DISCHARGE HIM

90.    Immediately after Defendant SCS became aware that Plaintiff Galante had filed a complaint with the EEOC alleging that Defendant SCS had discriminated against her, Defendant SCS' employees committed egregious acts of retaliation against Plaintiff Johns, who was still employed by Defendant SCS.

91.    Like Plaintiff Galante, Plaintiff Johns had always received glowing reviews, and in fact was the ONLY employee in his department cross-trained to perform every duty therein.

92.    First Plaintiff Johns was warned that he was not working enough hours, even though his manager had previously advised him that, so long as his work was completed, he was not required to work 80 hours every two weeks.   Plaintiff Johns was told he would be terminated if it happened again.

93.    Plaintiff Johns repeatedly pointed out to the Defendant SCS that, according to Defendant SCS' employee handbook, an employee is considered "full time" if they work 70 hours every two weeks.   Defendant SCS' management repeatedly demanded that he work 80 hours and constantly harped on him about the issue.

94.    Defendant SCS then advised Plaintiff Johns that it had reviewed his hours and because he had missed 70 hours on some occasions they were going to have to cut his insurance but needed to talk to the insurance company first.

95.    A few weeks later, Plaintiff Johns was reprimanded for having low hours. Upon review of his pay stub he saw that his hours were low because he had called in sick on the Friday before Labor Day, and that Defendant SCS has also docked his holiday pay hours for Labor Day, and were counting those missed hours against him.

96.     Plaintiff Johns advised them that it was unfair to count Labor Day against him because the building was closed and locked and he could not have worked if he wanted to.     He was nonetheless forced to sign a formal warning.   Defendant SCS employees berated Plaintiff Johns for taking a sick day, and repeatedly noted that other employees came in sick.

97.     When Plaintiff Johns said that he knew he was contagious and did not want to make anyone else sick, he was told that it was not his decision to make, and that he should come to work and let Defendant SCS management tell him whether or not he should go home sick.

98.     Plaintiff Johns asked that the meeting and his explanations be documented. Human Resource Manager Dagen replied sarcastically, "I'll be sure to put that you couldn't come in because you had a sore throat."

99.     Plaintiff Johns was then reprimanded for being late.   He responded that he was often late because he was responding to emergency calls for the fire department and that it was illegal for Defendant SCS to reprimand him for being late for that reason.

100.    Finally, Plaintiff Johns was constantly ridiculed following the filing of the EEOC Complaint.   Each time he was handed his paycheck HR Manager Dagan would loudly state "biting the hand that feeds" and act disgusted. Plaintiff Johns was constantly screamed at and threatened until he was forced to quit.

101.    HR Manager Dagan also harassed Plaintiff Galante by leaving her a voice mail message wherein she asked why she had filed a complaint against Defendant SCS and noting that SCS had always treated her so well.

## AS AND FOR A FIRST CAUSE OF ACTION

102. Plaintiff Galante repeats and realleges each and every allegation contained in paragraphs "1" through "101" as if set forth herein.

103. Plaintiff Galante was a pregnant woman at all relevant times herein and therefore a member of a protected class under 42 U.S.C. §§ 2000 et seq.

104. Plaintiff Galante was qualified to work as an employee and as an Assistant Manager for Defendant SCS and she satisfactorily performed the duties required by the position she held at Defendant as well as the Assistant Manager position.

105. Defendant SCS subjected Plaintiff Galante to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff Galante's discharge, because of her pregnancy.

106. Upon information and belief Plaintiff Galante's previous position as well as the Assistant Manager Position remained open and were filled by non-pregnant employees.

107. By reason of Defendants SCS' violations of Plaintiff Galante's rights, Plaintiff Galante has suffered a loss of monetary and other benefits associated with her employment.

108. As a further direct and proximate result of Defendant SCS' unlawful employment practices, Plaintiff Galante has suffered physical manifestations of stress, risk to her pregnancy, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A SECOND CAUSE OF ACTION

109.    Plaintiff Galante repeats and realleges each and every allegation contained in paragraphs "1" through "108" as if set forth herein.

110.    Plaintiff Galante was a pregnant woman at all relevant times herein and therefore a member of a protected class under New York Executive Law §296 et seq.

111.    Plaintiff Galante was qualified to work as an employee and as an Assistant Manager for Defendant SCS and she satisfactorily performed the duties required by the position she held at Defendant as well as the Assistant Manager position.

112.    Defendants subjected Plaintiff Galante to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff Galante's discharge, because of her pregnancy.

113.    Upon information and belief Plaintiff Galante's previous position as well as the Assistant Manager Position remained open and were filled by non-pregnant employees.

114.    By reason of Defendants SCS' violations of Plaintiff Galante's rights, Plaintiff Galante has suffered a loss of monetary and other benefits associated with her employment.

115.    As a further direct and proximate result of Defendant SCS' unlawful employment practices, Plaintiff Galante has suffered physical manifestations of stress, risk to her pregnancy, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to

her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A THIRD CAUSE OF ACTION

116. Plaintiff Galante repeats and realleges each and every allegation contained in paragraphs "1" through "115" as if set forth herein.

117. Plaintiff Galante was a pregnant woman at all relevant times herein and therefore a member of a protected class under New York City Administrative Code, § 8-101 et seq.

118. Plaintiff Galante was qualified to work as an employee and as an Assistant Manager for Defendant SCS and she satisfactorily performed the duties required by the position she held at Defendant as well as the Assistant Manager position.

119. Defendant SCS subjected Plaintiff Galante to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff Galante's discharge, because of her pregnancy.

120. Upon information and belief Plaintiff Galante's previous position as well as the Assistant Manager Position remained open and were filled by non-pregnant employees.

121. By reason of Defendants SCS' violations of Plaintiff Galante's rights, Plaintiff Galante has suffered a loss of monetary and other benefits associated with her employment.

122. As a further direct and proximate result of Defendant SCS' unlawful employment practices, Plaintiff Galante has suffered physical manifestations of stress, risk to her pregnancy, extreme mental anguish, outrage, severe anxiety about her future

and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A FOURTH CAUSE OF ACTION

123.   Plaintiffs repeats and realleges each and every allegation contained in paragraphs "1" through "122" as if set forth herein.

124.   Plaintiff Johns was qualified to work for and did satisfactorily perform the duties required by the position he held at Defendant SCS.

125.   Plaintiff Johns was humiliated, harassed and treated to degrading behavior in retaliation for his wife's applying for disability leave and/or her filing for unemployment benefits following her termination, and/or for filing the EEOC Complaint against the Defendant SCS and/or for seeking legal assistance in violation of New York State Law and New York City Regulations.

126.   Plaintiff Johns was forced to quit because the treatment that he endured was so unprofessional and degrading.

127.   By reason of Defendants SCS' violations of Plaintiff Johns' rights, Plaintiff Johns has suffered a loss of monetary and other benefits associated with her employment.

128.   As a further direct and proximate result of Defendant SCS' unlawful employment practices, Plaintiff Johns has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful

25

embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs demands judgment against Defendants, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiffs are entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff Galante as follows:

(i)     On the First Cause of Action, awarding Plaintiff Galante compensatory damages in an amount to be determined at trial but in any case no less than $2,500,000.

(ii)    On the Second Cause of Action, awarding Plaintiff Galante compensatory damages in an amount to be determined at trial but in any case no less than $2,500,000.

(iii)   On the Third Cause of Action, awarding Plaintiff Galante compensatory damages in an amount to be determined trial but in any case no less than $2,500,000;

(iv)    On the Fourth Cause of Action, awarding Plaintiff Johns compensatory damages in an amount to be determined trial but in any case no less than $500,000;

(v)     Awarding Plaintiff Galante and Plaintiff Johns the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
        June 16, 2011

NESENOFF & MILTENBERG, LLP
Attorneys for Plaintiffs

By: _____

Andrew T. Miltenberg, Esq.
(AM-7006)
Megan S. Goddard, Esq.
(MG-7705)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
212.736.4500

27



EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: Aurora Galante<br>11 N. Delaware Avenue<br>North Massapequa, NY 11758 | From: New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2010-03243 | Jedediah Fix,<br>Investigator | (212) 336-3777 |

(See also the additional information enclosed with this form.)

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

_____
**Elizabeth Grossman,
Acting District Director**

2 — 16 — 2011
(Date Mailed)

cc: Director, Human Resources
SUPPORT CLAIMS SERVICES INC.
125 Baylis Road
Suite 290
Melville, NY 11747

Megan S. Goddard, Esq.
363 Seventh Avenue
Fifth Floor
New York, NY 10001